James R. TAYLOR, Plaintiff,

v.

**COOPER RIVER CONSTRUCTORS,**
Defendant.

Civ. A. No. 2:92–1306–18.

United States District Court,
D. South Carolina,
Charleston Division.

May 12, 1993.

E. Paul Gibson, Jr., Charleston, SC, for plaintiff.

Marvin Infinger, Charleston, SC, for defendant.

## ORDER

NORTON, District Judge.

This matter is before the court upon plaintiff's motion for finding of seaman status and plaintiff's motion for entitlement to payment for maintenance and cure. By consent of the parties, it was ordered that these issues would be decided by this court sitting without a jury.[1]

### I. BACKGROUND

This is a seaman's action for personal injuries brought under the Jones Act, 46 U.S.C.App. § 688. James Taylor (hereinafter "Taylor") was injured on July 2, 1991, when he was struck by a cable. On that date, Taylor was in the employ of Cooper River Constructors (hereinafter "Cooper River"). Taylor's primary work duties were on a rock barge owned by Cooper River. Taylor's work duties also varied occasionally between an unnamed spud (or "crane") barge; aboard the tug boat, Mr. Clyde; or on other tug boats or barges[2] in a fleet owned or operated by Cooper River.

At the time of the accident bringing about this action, Cooper River was constructing an artificial island of rock, riprap and concrete around a pier next to the spud barge. The spud barge was being used as a work platform. Located on the spud barge was a crane, which, among other things, was being used to remove the spud anchor to which the cable involved in the accident was attached.

Taylor's primary job assignment was not on the spud barge; rather it was on the rock barge. The rock barge's primary mission was to transport rocks from Shipyard Creek in North Charleston, approximately 5.25 nautical miles, to the site where the artificial island was being constructed. Taylor's primary duty was to operate a backhoe on the rock barge, which was used to load rocks onto the rock barge and to push the rocks off of the rock barge in order to construct an artificial island. In addition to operating the backhoe, Taylor was assigned several other minor tasks. Cooper River states that these "minor" tasks included "inspecting and pumping water from the rock barge, handling lines on the rock barge, serving as a lookout on the rock barge, rigging and inspecting the rock barge's navigation lights and charging the rock barge's navigation lights' batteries." Defendant's Memorandum, p. 2. Taylor claims that his various duties aboard the rock barge and the tug boats included "aiding in navigation, serving as lookout, operating machinery such as a 966 Caterpillar loader and a 955 Caterpillar loader, handling lines, serving as a deckhand, hooking the rock barge to the tug boats to prepare for the transportation of the rocks, rigging navigation lights, and loading and transporting rocks to the bridge site." Plaintiff's Memorandum, p. 2.

Both the rock barge and the crane barge were moved from place to place by the tug boats. Neither barge was registered or licensed with the United States Coast Guard. The tug boats were pusher-type tugs, licensed, documented and registered as vessels of the United States and were equipped with heads, galleys and sleeping facilities.

On July 2, 1991, Taylor was standing on the spud barge with his superior, Kissane, while the spuds of the spud barge were lifted from the bottom of the Cooper River.[3] The

---

1. The consent order was filed by this court on September 10, 1992.

2. At the hearing before this court, Taylor stated that he also worked on barges other than the rock barge. He worked on two barges, barge 4600 and barge 4100, which were crane barges. These barges were spudded down at the bridge construction site and were only moved a series of yards about the bridge site. Barge 4600 and barge 4100 were not utilized in movement from the company to the job site; whereas the rock barge was utilized in such movement for the

purpose of transporting rocks. The accident occurred on one of the spud barges. See Michael J. Kissane Deposition, p. 13 & 36 (p. 13, lines 6–8 & p. 36, lines 2–3) (hereinafter "Kissane Deposition") (Kissane was Taylor's supervisor and identifies barge 4100 as the barge on which the accident occurred.)

3. The memoranda in support. of each parties' position conflict as to the basic facts of this case. Taylor's memorandum asserts that he was standing on the tug boat at the time the cable came loose as a spud was being lifted from the rock

purpose of this maneuver was to prepare the spud barge for movement. The cable on the crane that was lifting the second spud parted,[4] causing the cable to run out of its pulleys and guides. The cable struck Taylor injuring his right arm, neck, back and spine.

As a result of the accident, plaintiff now moves this court for a finding of seaman status and also for a finding of entitlement to payment for maintenance and cure.

## II. ANALYSIS

### A. Motion for Finding of Seaman Status

█ The present Fourth Circuit test of seaman status requires:

(1) That the employee was more or less permanently attached to a vessel or fleet of vessels operated by the employer;

(2) That the employee's duties contributed to the function of the vessel for the accomplishment of its mission, (*See McDermott Int'l v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); *See also Southwest Marine, Inc. v. Gizoni*, — U.S. —, —, 112 S.Ct. 486, 492, 116 L.Ed.2d 405 (1991) (the employee's connection to a vessel in navigation governs the resolution of seaman

status, not the employee's particular occupation or job title)); and,

(3) That the vessel be in navigation.

*Harwood v. Partredereit*, 944 F.2d 1187 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992).

### 1. Permanent Attachment to a Vessel or Fleet of Vessels

█ Taylor was not "permanently attached" to the spud barge involved in the accident. Taylor was neither "permanently attached" to that spud barge nor was he attached to a fleet of vessels owned by Cooper River. Taylor spent virtually all of his time on the rock barge. His primary duty was to operate a frontend loader on the rock barge, and most, if not all, of his secondary duties took place on the rock barge as well.[5] Taylor had limited and sporadic connection with the spud barge. Taylor's "permanent attachment" was to the rock barge, not the spud barge on which the accident occurred nor to the fleet of vessels owned by Cooper River. *See DiGiovanni v. Traylor Bros., Inc.*, 959 F.2d 1119 (1st Cir.) (en banc), *cert. denied*, — U.S. —, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992).[6]

---

barge. Taylor's entire argument reads as if he were involved with raising a spud on the rock barge when injured. Taylor does not distinguish between the rock barge and the spud (or "crane") barge. Cooper River, however, contends that Taylor was not only involved with raising a spud on a spud barge but that he was also standing on that barge when the accident occurred. Kissane's deposition is in agreement with Cooper River's factual summary and reports that the accident occurred on barge 4100 (a spud or crane barge). Therefore, this court bases its ruling on Cooper River's presentation of the facts, i.e., that Taylor was not on the rock barge when the accident occurred.

4. Prior to the accident, one spud had already been successfully lifted.

5. In Taylor's own memorandum, he notes that nearly ninety-nine percent (99%) of his duties were performed aboard the spud barge. In this discussion, he refers to the "spud barge with the primary mission of transporting rocks." Therefore, this translates to read that nearly ninety-nine percent (99%) of Taylor's duties were performed aboard the rock barge.

6. Cooper River notes that the facts in *DiGiovanni* are similar to the facts in this case. The material facts in *DiGiovanni* are:

The BETTY F was a barge ... with a ... raked bow and stern, and with nautical equipment, such as navigation and anchor lights. In all respects it met the commonly understood characteristics of a vessel, and, indeed, was inspected by the Coast Guard. It had no means of self-propulsion, except that positional movement could be achieved by manipulating its spud anchors. Its current use was to float at the Jamestown, Rhode Island, bridge, bearing a crane that was being used for bridge construction. Its permanent station was Davisville, Rhode Island, from which it was towed, by a tug, from time to time, to perform various shore jobs. It had been at the Jamestown bridge for a month. It was positioned about the bridge, and moved away from the pilings at night, to prevent damage.

Plaintiff's principal duty was to handle a tag line to guide the crane, but he also did maintenance work, such as painting, and tended lines. Although he was attached to the BETTY F, at the time of his injury he was standing on the deck of a supply barge in order better to manipulate the line. Its deck proved to be slippery, and he fell. The supply barge was in general use to carry supplies, but also served as a work platform.

*Id.* at 1120–1121.

### 2. Duties Contributed to the Function of the Vessel for the Accomplishment of its Mission

Taylor's assistance in removing the spud anchor at the time of his injury in no way contributed to the function of the rock barge for the accomplishment of its mission. The rock barge's mission was to transport rocks from Shipyard Creek to the location of the artificial island at the bridge site. Removal of the spud anchor and movement of the spud barge in no way facilitated the movement of rocks or the dumping of the same on the artificial island.

If Taylor had been injured on the rock barge, the scenario would most probably result in a finding that Taylor met the second factor for the determination of seaman status. Taylor was "permanently attached" to the rock barge and his duties were likely to contribute to its function and mission in hauling rock to and dumping rock at the bridge site. Furthermore, it is more likely that the rock barge, rather than the spud barge involved in the accident, would be a "vessel in navigation." [7]

### 3. Vessel in Navigation

■ Because of the imprecision in the definition of a "vessel," whether a floating structure is a vessel is fact-specific. *See Ducote v. V. Keeler & Co.,* 953 F.2d 1000, 1003 (5th Cir.1992) (the Jones Act does not define "vessel"). The court finds that the spud barge in the present case is not a "vessel in navigation" capable of supporting a Jones Act claim. There are numerous decisions which hold that a barge being used as a work platform is not a "vessel in navigation" for purposes of the Jones Act. *See, e.g., DiGiovanni,* 959 F.2d 1119 (1st Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992); *Ellender v. Kiva Constr. & Eng'g, Inc.,* 909 F.2d 803 (5th Cir.1990); *Hurst v. Pilings & Structures, Inc.,* 896 F.2d 504 (11th Cir.1990); *Presley v. Healy Tibbits Constr. Co.,* 646 F.Supp. 203 (D.Md.1986).[8]

In *Ellender,* the Fifth Circuit stated:

In order to qualify as a Jones Act seaman, Ellender must have worked on a 'vessel'. . . .

\*　　\*　　\*　　\*　　\*　　\*

Based upon ... established principles, the Fifth Circuit has routinely held, as a matter of law, that neither a single construction barge nor several barges strapped together to form a floating construction platform constitute 'vessels' under the Jones Act. We summarized the rationale behind this decision in *Bernard v. Binnings Constr. Co., Inc.,* 741 F.2d [824] at 831 [ (5th Cir.1984) ]:

'A review of these cases indicates three factors common to them: (1) The structures involved were constructed and used

---

Plaintiff brought suit seeking to recover for the injuries he sustained when he slipped on the deck of the supply barge, alleging that he was a seaman and therefore entitled to the rights and privileges afforded a seaman under the Jones Act. *Id.* In reversing the jury's finding of "seaman" status under the Jones Act, the United States Court of Appeals for the First Circuit, held, among other things, that plaintiff was not "permanently assigned" to the supply barge.

7. A finding as to whether the rock barge is or is not a "vessel" is unnecessary. Furthermore, whether or not Taylor meets the second requirement of the Jones Act test for finding of seaman status is really irrelevant, since this court finds that the spud barge on which Taylor was injured is not a "vessel." *See infra* (Section II, subsection A.3).

8. This court again notes that Taylor's entire argument in both his memorandum and at the hearing before this court was premised on the notion

that the *rock* barge is a vessel. Taylor cited *Ducote,* 953 F.2d 1000 (5th Cir.1992), to support this argument. While Taylor's reasoning may be persuasive with regards to the rock barge, it does not support a finding that the spud barge is a vessel.

In *Ducote,* the court noted that the scope of the job called for the spud barge to be moved approximately five (5) miles along the bank of the river. This "planned extensive movement" was critical to the court's finding that the transportation function of the spud barge was more than incidental to the use of the barge as a work platform. This, however, is not the situation with the spud barge in the present case. *Id.* at 1004 n. 19 (list of cases holding that barges that moved only a few feet or not at all are not vessels). Once Cooper River's spud barge was brought to the work site, it was moved by a tug only "several yards" to reposition and facilitate bridge construction. Thus, it is not a vessel for purposes of the Jones Act.

primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.'

*Ellender*, 909 F.2d at 806 (some citations omitted).

■ In *Hurst*, seaman status was denied as a matter of law to a diver who was injured when he attempted to climb out of the water onto his employer's spud barge.[9] The court concluded as a matter of law that the spud barge was not a vessel:

> In determining whether a special purpose structure like a spud barge is a vessel, the critical inquiry is 'the purpose for which the craft was constructed and the business in which it is engaged.'
>
> \*   \*   \*   \*   \*   \*
>
> That ... [defendant's] spud barge was constructed for the purpose of serving as a work platform, ... and that ... [it] was engaged as a work platform at the time of [the] ... injury is also undisputed. The barge was secured at least temporarily to the waterway floor at the time of the injury, and the barge's only transport function—carrying its own push boat, smaller barges, and crane—was incidental to its primary purpose of serving as a work platform.

*Hurst*, 896 F.2d at 506 (citation omitted).

In *DiGiovanni*, the First Circuit Court of Appeals was called upon to determine whether a barge being used as a work platform was a vessel in navigation. In holding that it was not, the court stated:

> [The] standard, as applied in a number of other Fifth Circuit cases, looking to use, rather than simply to the physical charac-

teristics of the structure, does appear a reasonable resolution of Jones Act principles as against mere definitions of vessels to convert longshoremen into seamen. A worker becomes a seaman not by reason of the physical characteristics of the structure to which he is attached, but because its being operational 'in navigation' exposes him to 'a seaman's hazards.' He is not exposed by what the vessel did in the past, or by its future potential, and to give him these special benefits by mechanical definitions without the exposure is misplaced generosity.... Just as we relied on *Offshore [Co. v. Robison*, 266 F.2d 769 (5th Cir.1959)] in the past, we believe we should now accept the Fifth Circuit's improved version. In sum, if a barge, or other float's 'purpose or primary business is not navigation or commerce,' then **workers assigned thereto** for its shore enterprise ought to be considered seaman only when it is in a **actual navigation** or **transit.**

*Id.* at 1123 (citations omitted) (emphasis added).

This court recognizes that courts have stated that a structure whose primary function is non-navigational or non-transportational. may still qualify as a vessel, if the structure was involved in navigation at the time of the injury. *See, e.g., Ellender*, 909 F.2d at 806. The spud barge in the present case, however, was not "in navigation." "The requirement that a vessel be in navigation 'means that the vessel [must be] engaged as an instrument of commerce or transportation on navigable waters.'" *Presley*, 646 F.Supp. at 206 (citations omitted). The purpose of the spud barge was not to transport people or articles of commerce. Rather its purpose was to serve as a base for constructing the bridge and to provide crane capabilities. "It was simply a situs for construction work. Thus, the cases which hold that floating con-

---

**9.** The diver in *Hurst* was working on a seawall, a structure connected to the river bottom, along the Intracoastal Waterway in Florida. This parallels work on a bridge. Bridge work injuries generally cannot support admiralty jurisdiction. "It is well established that a bridge is not a vessel within admiralty jurisdiction.... [T]he fact that [a piece of equipment] ... was attached to a

bridge establishes that it was not an appurtenance of the vessel, even though it may customarily be utilized in loading operations." *Whittington v. Sewer Constr. Co.*, 541 F.2d 427, 433 (4th Cir.1976) (citations omitted). In the present circumstances, of course, the work platform was normally anchored next to the bridge pier and was not attached to the bridge.

 

struction platforms are not vessels in navigation are applicable here." *Id.* (citations omitted).

There is some dispute as to the whether the spud barge was in the process of movement when the accident occurred. One spud attached to the spud barge had been removed from the sea bed prior to the accident. A second spud was being removed when the accident occurred. Kissane, in his deposition testimony, stated the following: "And as we either first started to move or were moving, the choker broke at the molly hogan." Kissane Deposition, p. 21 (lines 16–18). The spud barge, if it were moving at all, could only have moved a very minimal distance when the accident occurred. This is evident by the fact that the accident occurred while the second spud was being raised. On the basis of these facts, the court cannot find that the spud barge was "in navigation." [10]

Furthermore, the spud barge's primary mission was to act as a work platform in the construction of the bridge and to provide crane capabilities. The spud barge never travelled any substantial distance. It was only moved around the bridge site a matter of yards so as to reposition it for the building of the bridge. *Compare Ducote*, 953 F.2d 1000 & *see supra* p. 303 and note 8. Its mission was quite distinguishable from that of the rock barge.

### III. CONCLUSION

Taylor fails to meet the test of a seaman under the Jones Act. He was basically a worker engaged in job duties characteristic of those occurring on land—operating a backhoe. His duties, however, occurred on a rock barge. If the accident had occurred on the rock barge, a finding of seaman status would have been more likely. The accident, however, occurred on the spud barge. The court finds that (1) Taylor was neither "per-

manently attached" to the spud barge nor to a fleet of vessels owned by Cooper River; rather he was "permanently attached" to the rock barge; (2) Taylor's duties at the time of the accident did not contribute to the rock barge's mission of transporting rocks; and (3) the spud barge was not a "vessel in navigation."

It is therefore,

**ORDERED,** that plaintiff's, James R. Taylor's, motion for finding of seaman status under the Jones Act be **DENIED.** It is further

**ORDERED,** that plaintiff's, James R. Taylor's, motion for entitlement to payment for maintenance and cure be DENIED.

**AND IT IS SO ORDERED.**

---

**10.** In *Presley,* the court did not have to reach the question of whether the plaintiff should have been deemed a seaman if he had been injured while assisting *in the movement* of the barge itself during his work duties. The court noted, however, that "movement" of the barge should not change the result. 646 F.Supp. at 206 n. 1. The court stated: "the fact that the ... [barge] was being moved from one location to another would not convert it into 'an instrument of transportation' within the traditional and common meaning of the term." *Id.* This court finds this language persuasive. The fact that the spud barge may possibly have been in the process of movement from one location to another does not convert it into "an instrument of transportation" under the facts of this case.